UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

ABRAHAM ABDALLAH,

                              Plaintiff,

        -against-

EXPERIAN INFORMATION SOLUTIONS,
INC.,

                              Defendant.

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED:  3/16/2026
```

24 Civ. 9801 (AT)

**ORDER**

ANALISA TORRES, District Judge:

Plaintiff, Abraham Abdallah, brings this action against Defendant, Experian Information Solutions, Inc. ("Experian"), alleging willful and negligent violations of the Fair Credit Reporting Act (the "FCRA"), 15 U.S.C. § 1681 *et seq*. *See generally* Compl., ECF No. 1. Experian moves to compel arbitration and stay the proceedings pursuant to the Federal Arbitration Act (the "FAA"). *See* Mot., ECF 19; Mem., ECF No. 19-1; Opp., ECF No. 20; Reply, ECF No. 24. For the reasons stated below, the motion is GRANTED IN PART, and the action is STAYED. Specifically, the Court concludes that the 2017 Terms of Use agreement contains the operative arbitration agreement, and, pursuant to the delegation clause in that agreement, compels arbitration.

## BACKGROUND

I.      <u>Factual Background</u>

On February 13, 2017, Plaintiff enrolled in CreditWorks, a credit monitoring service provided by an Experian affiliate, ConsumerInfo.com, Inc. ("CIC"), which also does business as Experian Consumer Services ("ECS"). Smith Decl. ¶¶ 1, 3, ECF No. 19-2.[1]

---

[1] For the reasons explained below, the Court rejects Plaintiff's argument that Smith lacks personal knowledge of the facts included in his declaration.

Since then, Plaintiff disputed his credit reporting with Experian on several occasions.  In 2017, Plaintiff complained about Experian's failure to include his social security number in his credit file, which he claimed prevented creditors from verifying that the credit report was his. Tiktin Decl. ¶¶ 2–3, 8, ECF No. 20-1; Dispute Ltrs. I, ECF No. 20-2.  That issue was not resolved. *See* Opp. at 4.  Later, from at least May 2023 to March 2024, Plaintiff sent Experian several formal dispute letters addressing other inaccuracies in Experian's credit reporting.  Tiktin Decl. ¶ 5; Dispute Ltrs. II, ECF No. 20-3.

In March 2024, Experian ceased selling Plaintiff's credit report to creditors.  Compl. ¶¶ 10–11.  When creditors seek Plaintiff's credit report, Experian states that it "does not sell this consumer's credit report" based on "independent business considerations."  *Id.* ¶ 12; Refusal to Report Message, ECF No. 1-1.  As a result, Plaintiff alleges that several creditors have misinterpreted Experian's message as indicating a security freeze or insufficient credit history and financial institutions have denied Plaintiff credit based on Experian's refusal to provide them with his credit report.  Compl. ¶¶ 13–15, 21.  In July 2024, Plaintiff sent Experian a formal "[r]einvestigation request" regarding its refusal to report.  *Id.* ¶ 23; Tiktin Decl. ¶ 7; Reinvestigation Request, ECF No. 20-5.  In December 2024, Plaintiff brought this action alleging that Experian violated the FCRA.  *See generally* Compl.

II.    CreditWorks Enrollment & Terms of Use

A. Enrollment

To successfully enroll in CreditWorks, Plaintiff was required to complete two webforms. *Id.* ¶ 3.  On the first, Plaintiff entered his personal information, such as his name, address, phone number, and e-mail address.  *Id.*  Then, Plaintiff clicked the "Submit and Continue" button, which brought him to a second webform.  *Id.*  There, Plaintiff entered his social security number, date of

birth, and a username and password.  *Id.*  This webform included the following disclosure immediately below where Plaintiff entered and confirmed his password and immediately above the "Submit Secure Order" button:  *"By clicking 'Submit Secure Order': I accept and agree to your Terms of Use Agreement, as well as acknowledge receipt of your Privacy Policy and Ad Targeting Policy."  Id.* (emphasis added).  Depicted below is a copy of the second webform:



Second Webform, ECF No. 19-4; *see* Smith Decl. ¶ 3.

In the disclosure message, the phrase "Terms of Use Agreement" was offset in blue text and hyperlinked so that if clicked, it presented the consumer with the full text of the agreement. Smith Decl. ¶ 4.  Immediately below the disclosure was a large purple button that read:  "Submit Secure Order."  *Id.*  The form, the disclosure, and the "Submit Secure Order" button appeared on a single page.  *Id.*  Although Plaintiff did not need to click the "Terms of Use" hyperlink, he needed to click "Submit Secure Order" on the second webform to enroll in CreditWorks.  *Id.* ¶ 5.

Since 2017, CreditWorks has changed its Terms of Use several times.  Attached to Experian's papers are three versions of the Terms of Use in effect during Plaintiff's CreditWorks membership: (1) the operative agreement when Plaintiff enrolled in CreditWorks ("2017 Terms of Use"); (2) an updated agreement that eliminated the carve-out for FCRA claims from arbitration ("2019 Terms of Use"); and (3) the most recent agreement ("April 2023 Terms of Use").  *See* 2017 Terms of Use, ECF No. 19-5; 2019 Terms of Use, ECF No. 24-4; April 2023 Terms of Use, ECF No. 24-3.  The Court provides an overview of each in turn.

B.  2017 Terms of Use

The 2017 Terms of Use includes a section titled "Dispute Resolution by Binding Arbitration" ("2017 Arbitration Agreement") that generally requires Plaintiff to "arbitrate all disputes and claims" between him and ECS "arising out of this Agreement."  2017 Terms of Use at 4–5.[2]  However, the 2017 Arbitration Agreement explicitly excludes FCRA claims from mandatory arbitration.  Specifically, subsection (a) of the 2017 Arbitration Agreement states:

> (a) ECS and you agree to arbitrate all disputes and claims between us arising out of this Agreement directly related to the Services or Websites, except any disputes or claims which under governing law are not subject to arbitration.  This agreement to arbitrate is intended to be broadly interpreted and to make all disputes and claims between us directly relating to the provision of any Service and/or your use of any Website subject to arbitration to the fullest extent permitted by law.  ***However, for the avoidance of doubt, any dispute you may have with us arising out of the Fair Credit Reporting Act (FCRA) relating to the information contained in your consumer disclosure or report, including but not limited to claims for alleged inaccuracies, shall not be governed by this agreement to arbitrate.***  The agreement to arbitrate otherwise includes, but is not limited to: claims arising out of or relating to any aspect of the relationship between us arising out of any Service or Website, whether based in contract, tort, statute (including, without limitation, the Credit Repair Organizations Act) fraud, misrepresentation or any other legal theory; claims that arose before this or any prior Agreement (including, but not limited to,

---

[2] Although the Terms of Use agreement does not name "Experian Information Solutions, Inc.," the "Overview and Acceptance of Terms" section defines "ECS" to include its "affiliates," and the Arbitration Agreement similarly specifies that "ECS" includes its parent entities.  *See* 2017 Terms of Use at 2, 5.  During the entire time that Plaintiff has been enrolled in CreditWorks, Experian has been an affiliate of ECS.  Smith Decl. ¶ 6.  Plaintiff does not dispute that Experian may enforce the arbitration agreement.  *See generally* Opp.

claims relating to advertising); claims that are currently the subject of purported class action litigation in which you are not a member of a certified class; and claims that may arise after the termination of this Agreement.

*Id.* (emphasis added).

Subsection (c) includes a delegation clause, which specifies, in relevant part:

The arbitration will be governed by the Commercial Dispute Resolution Procedures and the Supplementary Procedures for Consumer Related Disputes (collectively, "AAA Rules") of the American Arbitration Association ("AAA"), as modified by this Agreement, and will be administered by the AAA. . . .

All issues are for the arbitrator to decide, including the scope and enforceability of this arbitration provision as well as the Agreement's other terms and conditions, and the arbitrator shall have exclusive authority to resolve any such dispute relating to the scope and enforceability of this arbitration provision or any other term of this Agreement including, but not limited to any claim that all or any part of this arbitration provision or Agreement is void or voidable.

*Id.*

Finally, subsection (g) provides consumers with a right to opt out of future modifications

to its arbitration provisions, providing:

Notwithstanding any provision in this Agreement to the contrary, ***we agree that if ECS makes any change to this arbitration provision*** (other than a change to the Notice Address) during your membership in any Service, including credit monitoring, or subsequent to your purchase of any Service, ***you may reject any such change and require ECS to adhere to the language in this provision as written at the time of your enrollment or purchase if a dispute between us arises regarding such Service.***

*Id.* at 6 (emphasis added).

The 2017 Terms of Use also includes an "Amendments" section, separate from the Arbitration Agreement, providing that that "[e]ach time [the user] order[s], access[es], or use[s] any of the Services or Websites, [they] signify [their] acceptance and agreement, without limitation or qualification, to be bound by the then current Agreement." *Id.* at 3. However, the "Amendments" section further provides that "any modification or update to the arbitration

provision shall be governed by subsection (g) of the [2017 Arbitration Agreement]." *Id.* The full

"Amendments" provision is set forth below:

> This Agreement may be updated from time to time. You should check this Website regularly for updates to this Agreement. Each time you order, access or use any of the Services or Websites, you signify your acceptance and agreement, without limitation or qualification, to be bound by the then current Agreement. Modifications take effect as soon as they are posted to this Website (or any of the Websites, to the extent applicable to you), delivered to you, or reasonably made available to you in writing by ECS. However, no unilateral amendment will retroactively modify the parties' agreed-to dispute resolution provisions of this Agreement for then-pending disputes, unless the parties expressly agree otherwise in writing. In all other respects, ***any modification or update to the arbitration provision shall be governed by subsection (g) of the Agreement's "Dispute Resolution By Binding Arbitration" Section below.***

*Id.* at 3 (emphasis added).

C.  2019 Terms of Use

The 2019 Terms of Use included a similar section on arbitration ("2019 Arbitration Agreement"). Notably, unlike the 2017 Terms of Use, the 2019 Terms of Use eliminates the carve-out for FCRA claims. Smith Supp. Decl. ¶ 5, ECF No. 24-1. Additionally, the 2019 Arbitration Agreement slightly modified subsection (g) by providing the user with a right to "reject any [] change [to the Arbitration Agreement] and require ECS to adhere to the language in [the Arbitration Agreement] as written at the time of your enrollment or purchase if a dispute between us arises . . . *by providing Notice to ECS at the Notice Address above prior to initiating your dispute*." 2019 Terms of Use at 6 (modification from 2017 Arbitration Agreement italicized). Experian does not argue that it emailed or otherwise drew Plaintiff's attention to the fact that the arbitration agreement was modified in the 2019 Terms of Use. *See generally* Mem.

D.  April 2023 Terms of Use

On April 3, 2023, Experian informed all CreditWorks members, including Plaintiff, via email that "(1) there were updates to the Terms of Use, (2) those updates including changes related

6

to the Arbitration Agreement, and (3) by continuing to use the Service and failing to opt out, [the members] agree[] to these changes." Smith Supp. Decl. ¶ 2. A copy of the email Plaintiff would have received is depicted below, *id.*:



Email Notice, ECF No. 24-2.

Like the 2017 and 2019 Terms of Use agreements, the April 2023 Terms of Use included an arbitration section ("April 2023 Arbitration Agreement"), with a few key differences. *See* April 2023 Terms of Use at 10–11. First, the April 2023 Arbitration Agreement does not provide a user with the right to require ECS to adhere to the terms of the arbitration agreement in effect at the time of their enrollment. *See* 2017 Terms of Use at 6; 2019 Terms of Use at 6 (with an addition requiring the user to provide notice to ECS). Likewise, the "Amendments" section of the April 2023 Terms of Use eliminated any reference to such a right and instead provides in full:

> This Agreement may be updated from time to time. You should check this Website regularly for updates to this Agreement. Each time you order, access or use any of the Services or Websites, you signify your acceptance and agreement, without

limitation or qualification, to be bound by the then current Agreement. Modifications take effect as soon as they are posted to this Website (or any of the Websites, to the extent applicable to you), delivered to you, or reasonably made available to you in writing by ECS. However, no ~~unilateral~~ amendment will retroactively modify the parties' agreed-to dispute resolution provisions of this Agreement for then-pending disputes, unless the parties expressly agree otherwise in writing. ~~In all other respects, any modification or update to the arbitration provision shall be governed by subsection (g) of the Agreement's "Dispute Resolution By Binding Arbitration" Section below.~~

April 2023 Terms of Use at 6, compared with 2017 Terms of Use at 3.

In addition, the April 2023 Arbitration Agreement contained a delegation clause similar to the delegation clause in the 2017 Arbitration Agreement, but with some modified language adding examples of issues that the arbitrator can decide:

All issues are for the arbitrator to decide including, but not limited to, (i) all issues regarding arbitrability, (ii) the scope and enforceability of this arbitration provision as well as the Agreement's other terms and conditions, (iii) whether you or ECS, through litigation conduct or otherwise, waived the right to arbitrate, (iv) whether all or any part of this arbitration provision or Agreement is unenforceable, void or voidable including, but not limited to, on grounds of unconscionability, (v) any dispute regarding the payment of arbitration-related fees, (vi) any dispute related to the dispute Notice provisions in subparagraph (b) (above), and (vii) any dispute related to Mass Arbitration (defined below). Pursuant to this agreement, the arbitrator has been delegated with, and possesses, exclusive authority to resolve all of the above-enumerated types of disputes.

April 2023 Terms of Use at 11.

### DISCUSSION

I.    Smith's Declaration

The Court rejects Plaintiff's argument that because Smith's declaration fails to meet the requirements of Federal Rule of Civil Procedure 56(c)(4), it cannot prove the existence of an arbitration agreement. *See* Opp. at 19–23. Under Rule 56, Smith's declaration must "be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4). Several courts

8

have considered the issue and have found that Smith's declaration satisfies Rule 56.  *See Simensky v. Experian Info. Sols., Inc.*, No. 25-1045, 2025 WL 3754509, at *2 (3d Cir. Dec. 29, 2025); *Austin v. Experian Info. Sols., Inc.*, 148 F.4th 194, 204 (4th Cir. 2025); *Lamonaco v. Experian Info. Sols., Inc.*, 141 F.4th 1343, 1348 (11th Cir. 2025); *Scribner v. Trans Union LLC*, 738 F. Supp. 3d 1301, 1305–06 (E.D. Cal. 2024); *see also Cimillo v. Experian Info. Sols., Inc.,* No. 21 Civ. 9132, 2023 WL 2473403, at *1 (S.D.N.Y. Mar. 13, 2023) (relying on a similar declaration to determine the existence of a valid arbitration agreement); *Levy v. Credit Plus, Inc.*, No. 21 Civ. 5541, 2023 WL 2644352, at *1 (S.D.N.Y. Mar. 27, 2023) (same).

The Court agrees with these decisions and is satisfied that Smith has sufficient personal knowledge to support the facts in his declaration, including that Plaintiff created an account with CreditWorks in 2017 and went through the online account creation process as described.  Smith's duties at Experian involve "supporting the consumer enrollment process into CreditWorks and related services," which requires that he be "familiar with, among other things, how consumers enroll, the forms they must complete to enroll, as well as the Terms of Use governing such services."  Smith Decl. ¶ 1.  In addition, Smith is familiar with "ECS's electronic databases that store consumer enrollment information, including the webpages a consumer would have encountered to complete their enrollment into CreditWorks, the personally identifiable information entered when enrolling, which buttons the consumer would have clicked on in the enrollment process, and [the] date and time of the consumer's acceptance of the Terms of Use." *Id.*  He is also knowledgeable about "ECS's internal records that document consumers' ongoing use of their CreditWorks account, including when a consumer logs into their account or changes their account information, as well as any time a consumer receives an email or alert through their Credit[W]orks membership." *Id.*  To obtain the facts in his declaration, Smith "retrieved

[Plaintiff's] CreditWorks membership information from ECS's databases upon receipt of [Plaintiff's] personally identifiable information" and then "confirmed [Plaintiff's] membership details, such as the date and time of enrollment, and the version of the Terms of Use [he] agreed to." *Id.*

"Because of his position and job duties, [Smith] thus has familiarity with, and personal knowledge of, the Experian CreditWorks platform and enrollment process." *Joseph v. Experian Info. Sols., Inc.*, No. 24 Civ. 1757, 2025 WL 2374071, at *4 (D. Conn. Aug. 15, 2025) (citing, for example, *Giallanzo v. City of New York*, 630 F. Supp. 3d 439, 458 (S.D.N.Y. 2022)).

In other words, Smith is not speculating as to what Plaintiff accessed, saw, or clicked, but rather is identifying, based on the personal knowledge obtained in his job, what was necessary to enroll in the CreditWorks when Plaintiff did and the various terms of use agreements in effect during Plaintiff's membership. Moreover, Plaintiff presents no countervailing evidence that he did not open the CreditWorks account in the manner Smith described. "To rebut Experian's evidence that he created an account, [Plaintiff] needed to do more than simply show that there is some metaphysical doubt as to the material facts." *Simensky*, 2025 WL 3754509, at *3 (citation and quotation marks omitted). Therefore, the Court relies on Smith's declaration for the purposes of this motion.

II.    Motion to Compel Arbitration

A.  Legal Standard

The FAA provides that arbitration agreements "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. Under the FAA, parties can petition a district court for an order directing that "arbitration proceed in the manner provided for in such agreement." 9 U.S.C. § 4.

10

The FAA reflects a "federal policy favoring arbitration" and the "fundamental principle that arbitration is a matter of contract." *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2011) (quotation marks omitted). Because arbitration is a matter of contract, the FAA does not allow a court to compel arbitration unless it is satisfied that the parties agreed to arbitrate a dispute. *See Coinbase, Inc. v. Suski,* 602 U.S. 143, 147–49 (2024).

To determine whether the parties have agreed to arbitrate a dispute, courts consider two questions: "(1) whether the parties have entered into a valid agreement to arbitrate, and, if so, (2) whether the dispute at issue comes within the scope of the arbitration agreement." *In re Am. Express Fin. Advisors Sec. Litig.*, 672 F.3d 113, 128 (2d Cir. 2011). The "parties may not delegate to the arbitrator the fundamental question of whether they formed the agreement to arbitrate in the first place." *Doctor's Assocs., Inc. v. Alemayehu*, 934 F.3d 245, 251 (2d Cir. 2019); *see Coinbase*, 602 U.S. at 152.

The initial question of whether a valid "agreement exists between the parties . . . is determined by state contract law." *Meyer v. Uber Techs., Inc.*, 868 F.3d 66, 73–74 (2d Cir. 2017). The party compelling arbitration "bears an initial burden of demonstrating that an agreement to arbitrate was made." *Zachman v. Hudson Valley Fed. Credit Union*, 49 F.4th 95, 101–02 (2d Cir. 2022). "This burden may be satisfied by the actual production of the arbitration agreement." *Roller v. Centronics Corp.*, No. 87 Civ. 5715, 1989 WL 71200, at *2 (S.D.N.Y. June 22, 1989).

In deciding a motion to compel arbitration, the Court applies a "standard similar to that applicable for a motion for summary judgment." *Id*. "The summary judgment standard requires a court to consider all relevant, admissible evidence . . . [and] draw all reasonable inferences in favor of the non-moving party." *Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 229 (2d Cir. 2016) (cleaned up). "If there is an issue of fact as to the making of the agreement for arbitration, then a

trial is necessary." *Bensadoun v. Jobe-Riat*, 316 F.3d 171, 175 (2d Cir. 2003).

### B.  Contract Formation

The Court holds that Plaintiff agreed to the 2017 Arbitration Agreement.  It is a basic tenet of contract law that, to be binding, a contract requires a "meeting of the minds" and "a manifestation of mutual assent." *Wu v. Uber Techs, Inc.*, 43 N.Y.3d 288, 298–99 (2024); *Starke v. SquareTrade, Inc.*, 913 F.3d 279, 288 (2d Cir. 2019) (citation omitted).[3]  New York courts look to "whether the [contract] term[s] [were] obvious and whether [they were] called to the offeree's attention."  *Starke*, 913 F.3d. at 289.  "This often turns on whether the contract terms were presented to the offeree in a clear and conspicuous way."  *Id.*  "In the context of web-based contracts, [courts] look to the design and content of the relevant interface to determine if the contract terms were presented to the offeree in a way that would put her on inquiry notice of such terms." *Id.*

In *Meyer*, the Second Circuit considered whether a user signing up for an Uber account agreed to an arbitration provision contained in Uber's "Terms of Service," which was hyperlinked on the sign-up screen.  868 F.3d at 70–71.[4]  The Second Circuit held that Uber provided reasonable notice of the arbitration provision contained in its terms of service because, *inter alia*, the "Terms of Service" was contained in a clear and conspicuous hyperlink; the payment screen included only necessary fields for registration; there was a clear message that creating an account constitutes agreement to the terms of service; the message, which included the hyperlink, was "spatially coupled" with the registration button and "temporally coupled" with the act of registration; and

---

[3] The parties agree that New York state law applies to questions of contract formation here.  *See, e.g.*, Mem. at 8, 12–13; Opp. at 14–15, 24.

[4] "The *Meyer* Court applied California law to the contract formation question, but noted that 'New York and California apply substantially similar rules for determining whether the parties have mutually assented to a contract term.'" *Starke*, 913 F.3d at 291 (quoting *Meyer*, 868 F.3d at 74).

the entire screen was visible at once, so it did not require the user to scroll beyond what was visible to find the terms of service.  *See id.* at 77–89.

Other courts in this district have analyzed the CreditWorks enrollment process and found that, like in *Meyer*, "the webpage design presented, and the language used in the [Terms of Use] clearly and conspicuously communicated the terms of the Arbitration Agreement to [P]laintiff." *Cimillo*, 2023 WL 2473403, at *5; *see Levy*, 2023 WL 2644352, at *7.  The Court agrees.  The "Terms of Use" was hyperlinked in blue, signaling to click the link; the webpage explicitly stated, "By clicking 'Submit Secure Order,' I accept and agree to your Terms of Use Agreement"; this language was immediately above the "Submit Secure Order" button; and the webpage was largely uncluttered.  *See* Second Webform; *Starke*, 913 F.3d at 296 ("So long as the purchaser's attention is adequately directed to a conspicuous hyperlink that is clearly identified as containing contractual terms to which the customer manifests assent by completing the transaction . . . , a hyperlink can be an effective device for specifying contract terms.").

The Second Webform is copied below:



Second Webform.

By submitting his enrollment, Plaintiff unambiguously manifested his "assent to arbitration" under the terms of the 2017 Terms of Use. *Levy*, 2023 WL 2644352, at *7 (citation omitted). "[W]here an internet or smartphone user does not explicitly say 'I agree' to the contractual terms, a court must determine whether a reasonably prudent user would understand his or her conduct to constitute assent to those terms." *Edmundson v. Klarna, Inc.*, 85 F.4th 695, 704 (2d Cir. 2023); *Wu*, 43 N.Y.3d at 303–04. "Here, as in *Meyer*, the close proximity between the notice of the [Terms of Use] and the ["Submit Secure Order"] button would make clear to '[a] reasonable user . . . that by clicking the registration button, [he] was agreeing to the terms and conditions accessible via the hyperlink, whether [he] clicked on the hyperlink or not.'" *Levy*, 2023 WL 2644352, at *7 (quoting *Meyer*, 868 F.3d at 79–80). Thus, Plaintiff unambiguously

14

manifested his assent to the arbitration agreement in the 2017 Terms of Use by clicking the button to create his CreditWorks account. *See id.*

### C. Operative Arbitration Agreement

Experian has modified its Terms of Use over time, and over the course of its briefing, has modified the basis for its motion to compel arbitration. In its opening brief, Experian largely argues that the Terms of Use agreement at the time Plaintiff enrolled in CreditWorks (the 2017 Terms of Use) is the basis for its motion to compel arbitration. *See generally* Mem. (discussing the 2017 Terms of Use); Smith Decl. (same). However, in its reply brief, Experian takes the position that the 2023 Terms of Use is the operative agreement. *See* Reply at 6–12.

Ultimately, the parties dispute whether the 2017 or the 2023 Arbitration Agreement is the operative arbitration agreement—and whether the Court or an arbitrator must resolve that question in light of the delegation clauses in both agreements. *See* Reply at 12. The Court addresses the second issue first, as it is a threshold question.

### i. Delegation

Experian argues that "the determination regarding which version of the arbitration agreement applies is a question of arbitrability that has been delegated." Reply at 12; *see id.* at 18. Experian is correct that parties can "agree by contract that an arbitrator, rather than a court, will resolve threshold arbitrability questions as well as underlying merits disputes." *Henry Schein, Inc. v. Archer & White Sales, Inc.*, 586 U.S. 63, 65 (2019). Experian's argument goes further than that, however. Experian effectively "argues that once parties form an arbitration agreement that contains a delegation clause, any dispute over whether that agreement was later modified or superseded is [also] a gateway question that has been delegated to the arbitrator." *Williams v.*

*Experian Info. Sols. Inc.*, No. 23 Civ. 1076, 2024 WL 3876171, at *16 (D. Ariz. Aug. 20, 2024). The Court disagrees.

To compel arbitration pursuant to an arbitration agreement, including an agreement to arbitrate disputes over arbitrability, the Court must determine what agreement the parties reached in the first place. This is confirmed by the Supreme Court's recent decision in *Coinbase*, which holds that before a delegation clause can be enforced, a court must decide whether the delegation clause controls. *See* 602 U.S. at 145. When a party challenges the validity of a contract, the Court "*must* consider the challenge before ordering compliance with that [arbitration] agreement." *Id.* at 152 (emphasis in original) (quoting *Rent-A-Center, Inc. v. Jackson*, 561 U.S. 63, 71 (2010)); *see id.* at 151 ("Arbitration and delegation agreements are simply contracts, and, normally, if a party says that a contract is invalid, the court must address that argument before deciding the merits of the contract dispute."). Therefore, before the Court can compel arbitration pursuant to a delegation clause, the Court must ascertain what the operative delegation clause is. In this case, because Plaintiff argues that the 2023 Arbitration Agreement is not the operative agreement (i.e., he challenges the validity of the agreement), the Court must determine whether the 2023 Arbitration Agreement supersedes the 2017 Arbitration Agreement before ordering compliance with it.[5]

Some courts have reached a different conclusion on similar facts. For example, in *Kisciras*, the plaintiff argued that the Terms of Use in effect at the time he enrolled in CreditWorks applied to his claims, and, because that Terms of Use excluded FCRA claims from arbitration, his FCRA dispute was not arbitrable. *Kisciras v. Experian Info. Sols., Inc.*, No. 23 Civ. 776, 2024 WL

---

[5] The Court recognizes that in *Coinbase*, the two contracts had conflicting delegation provisions, whereas here, it is not clear that there is any conflict between the delegation provisions in the 2017 and 2023 Arbitration Agreement. *See Coinbase*, 602 U.S. at 149. The Court nonetheless finds *Coinbase* illustrative for the principles discussed above. Moreover, although the delegation clauses in the 2017 Arbitration Agreement and the 2023 Arbitration Agreement are similar, the language is not identical.

16

1713704, at *3 (D.N.J. Apr. 22, 2024).  The district court held, however, that any dispute over "which competing version of the Terms of Use governs" was a question of "scope and arbitrability . . . reserved for an arbitrator."  *Id.*; *see also Smith v. Experian Info. Sols., Inc.*, No. 22 Civ. 6471, 2023 WL 6057377, at *3 (D. N.J. Sept. 14, 2023) ("Regardless of which Terms of Use is in effect, the Plaintiff would still be subject to a . . . valid delegation clause that requires referral to the arbitrator to determine the scope of the arbitration clause.").

The Court does not find these non-binding cases persuasive.  As an initial matter, both cases were decided without the benefit of the Supreme Court's decision in *Coinbase*.  *See id.*  In addition, "[a]lthough identifying which version of the arbitration agreement is applicable may be outcome-determinative when it comes time for the arbitrator to decide the delegated issue of scope (*i.e.*, whether Plaintiff's claim falls within the scope of the applicable agreement), it is not in itself a dispute *over* scope"—instead, it is a "non-delegable question of contract formation" involving "whether an earlier version of a contract has been superseded by a later version."  *Williams*, 2024 WL 3876171, at *17.  Furthermore, even if Plaintiff is subject to a valid delegation clause regardless of which agreement controls, it is still the Court's responsibility to determine *which* delegation clause, if any, the Court is enforcing by compelling arbitration.  *See Granite Rock Co. v. Int'l Bhd. Of Teamsters*, 561 U.S. 287, 297 (2010) ("To satisfy itself that such an agreement exists, the court must resolve any issue that calls into question the formation or applicability of the *specific arbitration clause* that a party seeks to have the court enforce." (emphasis added)).  Therefore, the Court considers whether the 2017 or 2023 Arbitration Agreement governs.

### ii.  Modification

Experian has not demonstrated that the parties are bound by the 2023 Arbitration Agreement.  When Plaintiff created his CreditWorks account, the 2017 Terms of Use was the

operative agreement.  Smith Decl. ¶¶ 3, 5.  Experian argues that the 2023 Terms of Use is in effect now because "[e]very version of the Terms of Use contains an Amendments clause, which provides that '[e]ach time [Plaintiff] order[s], access[es] or use[es] any of the Services or Websites, [he] signif[ies] [his] acceptance and agreement, without limitation or qualification, to be bound by the then current Agreement.'"  Reply at 7 (quoting Smith Decl. ¶ 7).

That is misleading.  The "Amendments" clause in the 2017 Terms of Use specifies that "any modification or update to the arbitration provision shall be governed by subsection (g) of the [Arbitration Agreement]."  2017 Terms of Use at 3.  Subsection (g), in turn, provides that the user may reject any future "change to this arbitration provision" and "require [Experian] to adhere to the language in this provision as written at the time of your enrollment or purchase if a dispute between us arises."  2017 Terms of Use at 6.  Therefore, with respect to amendments to the Arbitration Agreement, Plaintiff was given a right to "require [Experian] to adhere to the language" in the 2017 Arbitration Agreement if a dispute arises, even if Experian made subsequent modifications to the Arbitration Agreement.  *See Aramony v. United Way of Am.*, 254 F.3d 403, 413 (2d Cir. 2001) (noting that in contract construction, "specific terms and exact terms are given greater weight than general language" (quoting Restatement (Second) of Contracts § 203(c))).

Experian has not demonstrated that this right has been eliminated by a valid contract modification.  First, because the right to opt out of future modifications to the 2017 Arbitration Agreement is contained in the 2017 Arbitration Agreement itself, the Court agrees with Plaintiff that his right to opt out of modifications to the 2017 Arbitration Agreement is "ironclad, regardless of any alleged later modifications" to the Arbitration Agreement.  Opp. at 8–9.  Second, even if Experian could eliminate that right via subsequent modification of the Terms of Use, Experian has not demonstrated that it has successfully done so.

18

The Court concludes that Plaintiff did not agree to modify the 2017 Terms of Use when Experian rolled out its 2023 Terms of Use.  Contract modification is a question of contract formation, and New York law, therefore, demands affirmative proof of both "reasonably conspicuous notice" and "unambiguous manifestation of assent" to new contract terms when a contract is modified.  *Meyer*, 868 F.3d at 75.  In determining whether an "offeree is on inquiry notice of [new] contract terms, New York courts look to whether the term was obvious and whether it was called to the offeree's attention."  *Starke*, 913 F.3d at 289.  Experian argues that Plaintiff was on inquiry notice that Plaintiff's right was eliminated because, on April 4, 2023, Experian advised him via email of changes to the Arbitration Agreement, and the new Arbitration Agreement did not contain that right.

The Court finds that Experian's email, which is depicted below, did not put Plaintiff on inquiry notice that Plaintiff's right to insist on adherence to the 2017 Arbitration Agreement was eliminated.  The email states that under the new Terms of Use, the parties' "rights to arbitration of claims" have changed.  *See* Email Notice.  But this language says nothing about Plaintiff's overriding right to opt out of modifications to the arbitration agreement, nor does it draw Plaintiff's attention to any changes to the separate "Amendments" section eliminating that opt-out right.  *See* Email Notice.  Indeed, an email notifying Plaintiff of changes to the "rights in arbitration" in general terms is unlikely to draw his attention to the elimination of his right to opt out of such changes because if he reasonably believes that he has this right, there would be no need to inquire into or review the changes to the Arbitration Agreement.

19



Email Notice.

In addition, with respect to email design, the subject line does not draw users' attention to an updated "Terms of Use." *See* Email Notice.  Rather, the subject line states, "See your latest Experian credit report, FICO® Score and other updates." *Id.*  Other aspects of the email design are also lacking.  For example, the top of the email includes updates unrelated to the changed "Terms of Use," there is clutter on the page,[6] and the "Terms of Use" hyperlink is displayed using some of the smallest text on the page. *See Starke*, 913 F.3d at 293 ("The 'Terms & Conditions' hyperlink is some of the smallest text in the email and comes after several prompts unrelated to the [updated terms].").  Moreover, the essential message that continued use of Experian's products constitutes an agreement to the amended Terms of Use both (i) does not hyperlink the updated

---

[6] For example, there is a large title stating, "Frank, explore your updates for this month," followed by unrelated subheadings; two large hyperlinked purple boxes stating, "Check your activity"; and four large blue icons with hyperlinks under a header stating, "Check out what's new."

20

Terms of Use and (ii) is spatially separated from the hyperlinked Terms of Use by an unrelated sentence about the personalization of connected accounts. *Nicosia*, 834 F.3d at 237 ("The [key] message itself . . . is not bold, capitalized, or conspicuous in light of the whole webpage.").

In sum, the Court finds that (1) Plaintiff's right to opt out of modifications to the Arbitration Agreement could not be eliminated by a modification to the Arbitration Agreement itself because Plaintiff can always reject such modifications, and (2) Plaintiff did not agree to the elimination of that right via the 2023 Terms of Use because he did not receive notice of the terms eliminating that right. Therefore, Plaintiff retains the right to insist on Experian's adherence to the 2017 Arbitration Agreement, and he is not bound by the 2023 Arbitration Agreement.[7]

### D. Scope of Arbitration

Having concluded that the 2017 Arbitration Agreement is the operative arbitration agreement, the Court's inquiry is at an end because any disputes related to the scope of the arbitration agreement must be decided by the arbitrator. For the reasons explained below, the Court concludes that the 2017 Arbitration Agreement includes a valid, enforceable delegation clause. Consequently, the Court "possesses no power to decide the arbitrability issue," *i.e.*, whether Plaintiff's claims in this action are subject to arbitration under the 2017 Arbitration Agreement, "even if the [C]ourt thinks that the argument that the arbitration agreement applies to a particular dispute is wholly groundless." *Henry Schein, Inc.*, 586 U.S. at 68.

### i. Valid Agreement to Delegate

A valid agreement to delegate questions of arbitrability requires "clear and unmistakable evidence from the arbitration agreement . . . that the parties intended that the question of

---

[7] Alternatively, the Court need not consider Experian's argument about the April 2023 Terms of Use because Experian raises arguments about this agreement for the first time in its reply brief. *See Patterson v. Balsamico*, 440 F.3d 104, 113 n.5 (2d Cir. 2006) (noting that courts generally do not consider arguments raised for the first time in a reply brief); *see generally* Reply; Smith Supp. Decl.

arbitrability shall be decided by the arbitrator." *Bell v. Cendant Corp.*, 293 F.3d 563, 566 (2d Cir. 2002) (emphasis omitted) (citation omitted). The 2017 Arbitration Agreement provides that "[a]ll issues are for the arbitrator to decide, including the scope and enforceability of this arbitration provision as well as the Agreement's other terms and conditions." 2017 Terms of Use at 5. The Court finds that this clear and broad language "evinces a clear and unmistakable intention to delegate the question of arbitrability to the arbitrator." *Alvarez v. Experian Info. Sols., Inc.*, 661 F. Supp. 3d 18, 28 (E.D.N.Y. 2023) (citing cases). "Numerous courts have come to the same conclusion when dealing with identical language." *Id.* (collecting cases).

Plaintiff argues that because FCRA claims are clearly excluded from the 2017 Arbitration Agreement, there can be no "clear and unmistakable" evidence that he delegated the question of whether FCRA claims are covered by the arbitration provision to the arbitrator. *See* Opp. at 11 (arguing that the FCRA carve-out creates ambiguity that precludes clear and unmistakable evidence of delegation). The Court disagrees. In support of his argument, Plaintiff cites *DDK Hotels, LLC v. Williams-Sonoma, Inc.*, 6 F.4th 308 (2d Cir. 2021), which held that although the relevant arbitration agreement incorporated AAA rules delegating of questions of arbitrability to the arbitrator, "exclusionary language suggesting that the parties consented to arbitrate only a limited subset of disputes" created ambiguity as to the parties' intent regarding delegation. *Id.* at 319. *DDK Hotels* is inapposite, however, because its holding stemmed from the fact that there was "no express delegation of authority to an arbitrator to resolve questions of arbitrability." *Id.* at 323 n.6. That is not the case here. *See* 2017 Terms of Use at 5. The explicit language here— stating that "all issues are for the arbitrator to decide, including the scope and enforceability of this arbitration provision," *see id.*—is the exact type of language that constitutes clear and unmistakable evidence of an intent to delegate all questions of arbitrability.

Therefore, the Court may not "short-circuit the process and decide the arbitrability questions" itself, even if "the argument that the arbitration agreement applies to the particular dispute [appears to be] 'wholly groundless.'" *Henry Schein*, 586 U.S. at 65. "Arbitrators can efficiently dispose of frivolous cases by quickly ruling that a claim is not in fact arbitrable." *Id.* at 71. That is not a reason not to enforce the delegation clause or to find that no agreement to delegate questions of arbitrability exists. *See id.*

### ii. Unconscionability

Plaintiff alternatively argues that the delegation clause in the 2017 Arbitration Agreement should not be enforced because it is unconscionable. *See* Opp. at 24–25. "An unconscionable contract is one 'which is so grossly unreasonable as to be unenforceable because of an absence of meaningful choice on the part of one of the parties together with contract terms which are unreasonably favorable to the other party.'" *Giron v. Refined Stone Ltd.*, No. 22 Civ. 3558, 2025 WL 2772910, at *4 (E.D.N.Y. Sep. 28, 2025) (citation omitted). "Generally, New York law requires a showing of both procedural and substantive unconscionability." *Id.* (emphasis omitted) (citing *Ragone Atl. Video at Manhattan Ctr.*, 595 F.3d 115, 121 (2d Cir. 2010)).

Plaintiff argues that the delegation clause is procedurally unconscionable because the 2017 Terms of Use "was presented as a non-negotiable adhesion contract on a take-it-or-leave-it basis." *Id.* at 24. However, applying New York law, the Second Circuit has held that the fact that an arbitration agreement was offered on a "take it or leave it" basis is insufficient to render the agreement procedurally unconscionable. *See Ragone*, 595 F.3d at 122. Plaintiff claims neither that he was required to use Experian's services, nor that Experian used high-pressure tactics to coerce his acceptance. *See Nayal v. HIP Network Servs. IPA, Inc.*, 620 F. Supp. 2d 566, 571–72 (S.D.N.Y. 2009). Similarly, Plaintiff's argument that "the delegation clause was buried within the

23

dense arbitration provision, accessible only via hyperlink, without specific emphasis or explanation of its legal significance" is unpersuasive. Opp. at 24. The delegation clause is contained within the clearly titled "Dispute Resolution by Binding Arbitration" section and marked by the start of a new paragraph stating, in the same color and font as all other provisions, "All issues are for the arbitrator to decide, including the scope and enforceability of this arbitration provision." 2017 Terms of Use at 5; *see App. of Whitehaven S.F., LLC v. Spangler*, 45 F. Supp. 3d 333, 351 (S.D.N.Y. 2014) ("Under New York law, . . . the fine print of the clauses does not make them unconscionable as long as those clauses have the same font size and color with other clauses."). Because Plaintiff has not demonstrated procedural unconscionability, the delegation clause is enforceable, and the parties have agreed to delegate all disputes related to the scope of the arbitration agreement.

### E.  Stay

"The district court must stay proceedings once it is satisfied that the parties have agreed in writing to arbitrate an issue or issues underlying the district court proceeding." *Nicosia*, 834 F.3d at 229 (citation and quotation marks omitted). Because the Court determines the parties agreed to arbitrate arbitrability under the 2017 Arbitration Agreement, a stay is required.

25

## CONCLUSION

Experian's motion to compel arbitration is GRANTED, but only insofar as it seeks to compel arbitration pursuant to the delegation clause in the 2017 Arbitration Agreement. The action is STAYED pending resolution of the arbitration proceeding. Within one week of the conclusion of arbitration proceedings, the parties shall file a status update.

The Clerk of Court is respectfully directed to terminate the motion at ECF No. 19.

SO ORDERED.

Dated: March 16, 2026
New York, New York

_____
ANALISA TORRES
United States District Judge